SCHUPPHAUS v. E. I. DU PONT DE NEMOURS POWDER CO.

(District Court, D. New Jersey. April 22, 1913.)

PATENTS (§ 312*)—SUIT FOR INFRINGEMENT—PLEA OF OWNERSHIP—PRACTICAL CONSTRUCTION OF CONTRACT.

A plea filed by the defendant in an infringement suit, alleging ownership in itself of the patent in suit by virtue of a contract requiring complainant and others to assign to it patents relating to a certain subject, *held* not sustained by the evidence; it appearing that, as construed by the parties, all of the patents called for by the contract had been assigned and the full purchase price paid.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 544–549; Dec. Dig. § 312.*]

In Equity. Suit by Robert C. Schupphaus against the E. I. Du Pont de Nemours Powder Company. On final hearing. Decree for complainant.

Binney & Mastick, of New York City (Harold Binney, of New York City, of counsel), for complainant.

J. P. Laffey, of Wilmington, Del. (Townsend & Button, of New York City, of counsel), for defendant.

CROSS, District Judge. The bill of complaint in this cause alleges that patent No. 526,752, owned by the complainant, has been infringed by the defendant, and asks the usual relief in such cases. The defendant in due course filed a plea, which alleges, in substance, that the patent in suit was its property, and not the property of the complainant. To this plea the complainant filed a replication. Under the issue thus joined the parties have taken testimony, and the question now presented to the court for answer is whether or not, under the evidence, the plea is true. Upon that issue the burden of proof rests upon the defendant. The issue is obviously narrow, and the evidence relating thereto is not voluminous.

On or about March 8, 1897, a Virginia corporation, known as the Maxim Powder & Torpedo Company, as party of the first part, en-

tered into an agreement with six named individuals, who together constituted a copartnership under the firm name of E. I. Du Pont de Nemours & Co., as party of the second part. Said agreement, among other things, contained the following clause:

"The said party of the first part, with respect to any and all letters patent of the United States owned or applied for, either by it or by any of its stockholders, concerning or relating to the manufacture of a perforated grain of smokeless powder and of the ingredients and formula thereof, and the mixing of the same, further agrees that it will cause the same to be assigned, transferred, and set over unto Edward G. Bradford, of Wilmington, Delaware, to hold the said letters patent, now issued or applied for as aforesaid, in trust," etc.

The trust thus indicated was declared to be for the benefit of said copartnership.

Another contract, which recognized and in some respects modified the above, was entered into some time in January, 1898, between Hudson Maxim, Frederick E. McGahie, and Robert C. Schupphaus (the complainant), as parties of the first part, and the copartnership of E. I. Du Pont de Nemours & Co., composed as above mentioned, as party of the second part. This contract referred to the agreement of March 8, 1897, recited the provision thereof with reference to the transfer of all patents owned or applied for by the party of the first part thereto, or by any of its stockholders, concerning or relating to the manufacture of smokeless powder, to a trustee for the benefit of the party of the second part, stated that such agreement had been in part performed, but that said patents had not been transferred to a trustee, and then, after stipulating a reduced consideration for such transfer, provided that the patents should be transferred absolutely and directly to the party of the second part. The parties of the first part to this later agreement of January, 1898, were recited therein to be stockholders of the Maxim Powder & Torpedo Company, the party of the first part to the first agreement.

The case shows, and it is not disputed, that both of the agreements above referred to were subsequently assigned by several mesne assignments from the copartnership of E. I. Du Pont de Nemours & Co. to the defendant herein, and that they were in the possession of and were produced by it when the testimony in this suit was taken. It also appears that on or about the date of the first agreement the complainant executed six several assignments of that many patents then owned and controlled by him to said Bradford in trust, which assignments were delivered to the Du Ponts, together with certain information, and that there was paid to the complainant at that time the sum of $25,000 by said copartnership as a part of the consideration mentioned in said agreement. It appears, however, that the person therein named as trustee declined to act, whereupon the Du Ponts, as appears from their own letter, subsequently and on or about May 13, 1897, returned said assignments to Schupphaus with a request that he would transfer them to Mr. John S. Gerhard, as trustee, stating that the desired change in the name of the trustee was in accordance with an agreement executed by the Maxim Powder & Torpedo Company. Subsequently, and in compliance with said request,

204 F.—40

Schupphaus made and executed other assignments of said patents to Gerhard as trustee, which, however, apparently never became operative, whereupon the agreement of January 8, 1898, was executed, and during that month, and as provided in that agreement, the six patents above referred to, with an additional one, were assigned absolutely and directly to the firm of E. I. Du Pont de Nemours & Co. With the delivery of these assignments, the balance of the purchase money, as fixed by the January, 1898, agreement, was paid.

It also appears in the case that an agreement was entered into December 15, 1896, between E. I. Du Pont de Nemours & Co., of the one part, and Robert C. Schupphaus, of the other part, by virtue of which the party of the first part, in consideration of the free use of all the patents covering the manufacture of a perforated grain of smokeless powder and of the ingredients, formula, and mixing the same, were to pay the party of the second part the sum of $25,000 in cash and a royalty thereafter from year to year, the exact. amount of which it is unnecessary to state. The complainant swears that, after this agreement was made with him, the Du Ponts told him that they would like, for reasons of their own, to be relieved from its terms and make another direct with the Maxim Powder & Torpedo Company, and that under this new agreement they, knowing that he was the owner, would ask him for an assignment of such patents as they thought ought to come to them, and that they then and there agreed with him upon the six specific inventions which were the subject-matter of the six Bradford assignments. The interviews at which these conversations, according to Mr. Schupphaus, took place, were held either late in December, 1896, or early in January, 1897, with Mr. Eugene Du Pont and Mr. Francis G. Du Pont, but chiefly with the latter. It was objected on the part of the defendant that the conversation just referred to is inadmissible as evidence, because intended to contradict and vary the terms of the written agreement of March 8, 1897. The rule of evidence thus invoked is not, however, applicable, since the witness was neither a party nor a privy to that agreement; furthermore, if the conversation took place after that agreement was executed, as under the evidence is possible, it would serve to modify rather than contradict it.

It is also urged that the testimony was objectionable because of the fact that Mr. Eugene Du Pont and Mr. Francis G. Du Pont have since died; but, as neither of the parties to this suit is suing or sued in a representative capacity, the objection is without merit. Furthermore, as the attempt is being made to hold Mr. Schupphaus to the terms of the agreement of March 8, 1897, by reason of its subsequent recognition by him in the manner already stated, it is altogether right and proper for him to show what interpretation was put upon it, and what scope and effect were given, it, by the predecessor of the party now seeking to charge him, at or prior to the time when it was first recognized by him. For what reason a seventh patent was. added to the six, and ultimately assigned with them to the copartnership of E. I. Du Pont de Nemours & Co., does not clearly appear. It does appear, however, that a question designed to elicit the information was

asked by complainant's counsel, but withdrawn because of an objection interposed thereto by defendant's counsel.

From what has already been said, it appears that certain specific patents were assigned by the complainant to the copartnership of Du Pont de Nemours & Co. by agreement, as complainant insists, with certain members of that firm, in full satisfaction of the terms of the agreement, and that upon the delivery of said assignments the full compensation was paid him. Furthermore, there is no evidence to show that after the transaction, running as it did through a period of nearly a year, and involving the preparation and execution of three separate sets of assignments, as well as a modification of the agreements, was, as the complainant contends, completed, any claim or demand was made upon him, under said agreements or otherwise, to assign the patent in suit, or, indeed, any other patent or patents.

In addition to the circumstances above mentioned, the complainant has shown by certain letters of the defendant's predecessors, parties to the above-mentioned agreement, as well as by letters of their attorney, that they in substance admitted that the transfer to them of the specific patents above referred to was in full satisfaction of the terms thereof. Among letters of that character is one dated December 10, 1897, to Dr. Schupphaus from the Du Pont copartnership, in which they say:

"We will be very much obliged to you if you will, in accordance with our letter written under date of May 13th last, in which we sent you the assignments of the patents which you had made out in the name of Judge E. G. Bradford, transfer these assignments to Mr. John S. Gerhard. This in accordance with an agreement executed by the Maxim Powder & Torpedo Company, granting this change in the name of the trustee. If we had these assignments, we would then have the agreement with the Maxim Powder & Torpedo Company completed, and it would allow us to send the assignments to Mr. Gerhard. * * * We are very anxious to get this matter finished, and all that remains is to receive from you the assignments transferred as stated. Trusting that you will give this matter prompt attention," etc.

Before passing to the next letter, special attention should be called to the sentence in the last which says:

"If we had these assignments, we would then have the agreement with the Maxim Powder & Torpedo Company completed."

Yet this agreement, thus admitted to have been completed, is the sole and only foundation of the defendant's case. If the defendant has any case, it is because this agreement, which the party in interest at the time said was completed, was nevertheless not completed; and it is this proposition which the defendant has sought to maintain, without any allegation of fraud, surprise, or mistake.

The following is an extract taken from another letter to the complainant from the same parties, dated January 13, 1898:

"Note what you say concerning the usual course to be pursued when it is desired to have assignments of patents on record at the Patent Office. We desire, before the payment of $81,250 [the amount provided for by the contract of January, 1898] is made, to have everything in proper shape at the Patent Office, and we will be much obliged to you if you will undertake to manage this matter for us previous to the cash payment referred to."

In a letter dated January 17, 1898, written to Schupphaus by the counsel of the Du Pont partnership, to whom, according to the evidence, the supervision of the transfers above referred to had been committed, the following appears:

"I will have a conference with you in New York to go over the papers and patents with you there, and arrange for the closing of the transaction at an early subsequent date."

On January 18, 1898, the Messrs. Du Pont wrote Dr. Schupphaus a letter as follows:

"Yours of 15th inst. is at hand, and we note the list of letters patent and applications for letters patent for which you · have executed assignment to us direct under date of January 13, 1898; also that you have written Mr. Vandergrift that Mr. Maxim, Mr. McGahie, and yourself will sign the paper which we think necessary. As to what you say concerning the closing of this transaction on Wednesday next, we would say we will do our very best to have this matter hurried forward; but, after a conversation over the phone this morning with Mr. Vandergrift, he tells us he will be in New York on Wednesday next, and will write you making an appointment, so that this matter can be hurried forward. We desire, when the transaction is closed, to take businesslike precautions in the matter of the assignment of the patent, because we know that you and Mr. Maxim will probably depart for Europe immediately after the receipt of the money; consequently, if there is anything that might interfere with the assignment at Patent Office of the patents to us, such as faulty registration or some other clerical error, we would have difficulty in attending to the matter after you and Mr. Maxim had departed. As stated, we are pressing the matter to a conclusion, and after Mr. Vandergrift's interview on Wednesday we have no doubt the end will be near at hand."

And on January 24, 1898, the counsel of the Du Ponts wrote another letter to the complainant, in which he says:

"A registered letter has just been received containing an acknowledgment of the Maxim Powder & Torpedo Company that it has no right, title, or interest of any kind whatsoever in or to any of the letters patent and applications therein mentioned, and that all license or licenses with respect thereto have been revoked and have no force or effect. Permit me to express my appreciation of the attitude you have assumed throughout this transaction."

The patents referred to in the last letter, and, indeed, in all of the letters, were those which were assigned directly to the Du Pont copartnership. In this connection, it should be noted that they also exacted from the complainant herein, as a prerequisite to the payment of the consideration for the assignment, an affidavit that he was the sole owner of the patents, and that there were no outstanding licenses pertaining to or affecting the same, all of which goes to show that great care was exercised to see that no error or mistake crept into the transaction.

On the other hand, the defendant produced a witness who testified that the complainant admitted to him that the patent in suit was included in the agreements above mentioned, and that the reason that it was not assigned with the other patents was because the Du Ponts said that they only cared for an assignment of those which they regarded as of the most importance. The making of these alleged admissions is, however, denied by the complainant. The same witness also produced three letters written to him by Dr. Schupphaus under

the following dates, February 19, 1897, February 26, 1897, and March 12, 1897, passages in which it is claimed conflict with the testimony of the complainant. It should be noted, however, that these letters, two of them, at least, and perhaps the third, were written when the transaction was inchoate, and before the agreement of March 8, 1897, was actually executed (there being some evidence that that agreement was not executed until the 12th of March), and almost a year prior to the writing of the Du Pont letters above referred to. Furthermore, an examination of the letters shows that they are not in direct conflict with the complainant's testimony, but rather show a willingness on his part, in order to hasten the completion of the transaction, to yield to any reasonable demand made upon him. As to the testimony of the witness who produced the letters, and to whom they were written, it should be said that it does not command respectful consideration. His desire to take control of his own examination, to answer such questions and such only as he deemed relevant, and particularly his refusal for the most part to answer questions which tended to show his employment by and possible resultant bias in favor of the defendant, render the bare reading of his testimony exasperating in the extreme; and this court has no hesitation in saying that, had a motion been made to suppress it, unless the witness were reproduced and submitted himself to a full and thorough cross-examination, the motion would have been granted, but, as it is, the weight and efficiency of his testimony are seriously impaired.

For the reasons above suggested, I conclude that the terms of the agreement have been satisfied, and that the predecessors of the defendant have had assigned to them all of the patents for which they bargained and paid. There is no allegation of surprise, accident, fraud, or mistake. There is evidence that the Du Ponts had actual knowledge of the patent in suit; at all events, since it was of record, they had the means of knowledge. The Messrs. Du Pont availed themselves of the services of counsel, and apparently acted from first to last with care, caution, and prudence. Moreover, at the close of the transaction their counsel expressed his appreciation of the complainant's attitude throughout. The evidence shows that the agreement as understood and interpreted by the parties has been performed. The law in such cases as generally held, may be found declared in the following cases:

Insurance Co. v. Dutcher, 95 U. S. 269, at page 273 (24 L. Ed. 410), wherein the court says:

"The practical interpretation of an agreement by a party to it is always a consideration of great weight. The construction of a contract is as much a part of it as anything else. There is no surer way to find out what parties meant than to see what they have done. Self-interest stimulates the mind to activity, and sharpens its perspicacity. Parties in such cases often claim more, but rarely less, than they are entitled to. The probabilities are largely in the direction of the former. In considering the question before us, it is difficult to resist the cogency of this uniform practice during the period mentioned as a factor in the case."

In District of Columbia v. Gallagher et al., 124 U. S. 505, 510, 8 Sup. Ct. 585, 588 (31 L. Ed. 526), Mr. Justice Matthews says:

"We think that the practical construction which the parties put upon the terms of their own contract, and according to which the work was done, must prevail over the literal meaning of the contract according to which the defendant seeks to obtain a deduction in the contract price."

See, also, Topliff v. Topliff, 122 U. S. 121, 131, 7 Sup. Ct. 1057, 30 L. Ed. 1110; Chicago v. Sheldon, 76 U. S. (9 Wall.) 50, 54, 19 L. Ed. 594.

But if the view of the case already taken were erroneous, and if the entire case were made to turn, as the defendant insists it should, upon a construction of the clause of the contract of March 8, 1897, hereinabove set forth, my conclusion would still be that the defendant, has not sustained the burden of proof resting upon it, and that consequently a decree should be entered in favor of the complainant upon the issue joined. The patent in suit does not directly concern or relate to the manufacture of a perforated grain of smokeless powder, nor does it relate to the ingredients and formula thereof, and the mixing of the same. It is true that the patent is called a process of nitrating cellulose, and is declared to relate generally to the manufacture of gun-cotton, and more particularly to the nitration step of the process in such manufacture. The defendant lays great stress upon this language, when coupled with the fact that nitro-cellulose or gun-cotton is an ingredient of smokeless powder. A thorough and careful examination, however, of the specification of the patent and of its claims, shows beyond question that this patent does not directly or necessarily have anything to do with the manufacture of nitro-cellulose. It merely provides, using its language:

"A simple and economical method of replenishing or bringing the weakened acids bath to its proper strength and proportions."

The evidence shows that, during the process of nitrating the cellulose, the use of an acids bath composed of definite proportions of sulphuric and nitric acids is requisite, and that such bath is weakened by use and must have its strength restored before it can be repeatedly used. That the process of the patent in suit is a process of restoration of the bath to its normal strength plainly appears, not only from the specification, but from the claims, in each of which the following language is used:

"In the art of nitrating cellulose the herein described method of restoring the weakened acids bath."

After which follows a description of the method of restoration. The defendant has produced two experts, who testified that the language of the contract embraces the patent in suit; but their testimony is deemed altogether insufficient for that purpose. Indeed, under the plain language of the agreement and the equally plain purpose of the patent, expert testimony is seemingly out of place. To hold that a contract which provided for the transfer and assignment of all the patents for the tools used in the construction of a house could reasonably and properly be construed to embrace a patent for the process of sharpening such tools, or the removal of rust therefrom, in order that they might be rendered usable again, would border

upon absurdity. But the process of the patent in suit performs relatively the same function that a method of sharpening the tools, or of removing rust therefrom, would in the case suggested. In the case at bar, the acids bath is admittedly weakened by use, and must either be discarded, and a new bath prepared of fresh acids, or the weakened acids must be restored to their normal strength. The patent is purely economical. This is admitted by the experts; for instance, one of them, in answer to an appropriate question, says:

"The restoration of the waste acids in the manufacture of nitro-cellulose is only an economical one. It enables these waste acids, after restoration, to be used over again; otherwise, they would have to be discarded."

At other places in his testimony, the same witness admits that the introduction of "a fortifying mixture" is for the purpose of economy, and to enable the nitro-cellulose to be manufactured at the least cost, while at other places he says, in substance, that an acids bath, having been once used for the purpose of nitrating cellulose, is not, without reinforcement, as effective as it originally was, and adds that by continued and repeated application of the bath in nitrating cellulose the time comes when it cannot be further used. Upon the whole question, it seems perfectly plain that a "perforated grain of smokeless powder" can be manufactured just as well, but not as economically, without knowledge of the process of the patent in suit as with. Furthermore, the process of the patent in suit does not, either necessarily or directly, concern or relate to the ingredients of a perforated grain of smokeless powder, or to the formula thereof, and the mixing of the same. To return to the illustration already used, the patent in suit is, speaking figuratively, a process for sharpening a tool which has become dull by use, and not a patent for the tool itself.

But again, even if it were admitted that the patent in suit concerns or relates to the manufacture of smokeless powder in general, that would not bring it within the purview of the language of the agreement upon which the defendant relies, since by that agreement no patent was to be assigned that did not concern or relate—

"to the manufacture of a *perforated grain* of smokeless powder, and of the ingredients and formula *thereof*, and the mixing *of the same.*"

It is apparent, therefore, that the contract referred to embraced such patents, and such only, as related to or concerned a particular form or kind of grain of smokeless powder, and that it did not include patents which might concern or relate to the manufacture of smokeless powder in general. The distinction between a perforated *grain of smokeless powder* and *smokeless powder* in general is one that has been made by the contract and must be observed. It can neither be obliterated nor ignored. There is no evidence that the patent in question relates to the manufacture of a perforated grain of smokeless powder, as distinguished from the ordinary grain of smokeless powder. The only evidence at all bearing on the subject of the manufacture of smokeless powder is that an acids bath is used in the manufacture of nitro-cellulose, which is an ingredient of smokeless powder.

For the reasons given, the defendant has not shown title in itself

to the patent in suit, and accordingly its plea to the effect that it has such title is false, and will be overruled.

Upon notice, a decree will be entered in favor of the complainant, with costs of suit.